# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| MICHAEL WILSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CAUSE NO.: 1:16-CV-24-TLS |
| SUPERINTENDENT, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Michael Wilson, by counsel, filed a habeas corpus petition to challenge his conviction for murder under Cause No. 49G04-704-MR-57737. Following a jury trial, on May 7, 2008, the Marion Superior Court sentenced Wilson to sixty years of incarceration with fifteen years suspended subject to five years of probation.

## FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the State courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> The facts most favorable to the verdict reveal that thirty-two-year-old Wilson and thirty-three-year-old Nupur Srivastava met at a drug and alcohol rehabilitation center in New York in November 2006. After Nupur was discharged from the center, she joined Wilson at his father's home in Indianapolis in January 2007, and later rented an apartment on the north side of town. In early April 2007, while Nupur was visiting her family in Maryland, her parents convinced her she needed to return to the rehabilitation center. Nupur briefly returned to Indianapolis to retrieve her belongings. The day before she was scheduled to leave Indianapolis, Nupur and Wilson were drinking whiskey and arguing on Wilson's father's patio when Wilson splashed Nupur with gasoline and set her on fire.

Nupur ran through Wilson's father's house to the bathroom where she filled up the bathtub and jumped into it to put out the flames. While she was in the bathtub, Wilson called 911 to report a fire. During the phone call, Nupur asked Wilson why he had done that. Wilson responded, "I didn't think it was going to be like that, I swear." When paramedics arrived at the scene, Nupur walked unassisted out of the garage. Paramedic Jeff Brown ran to Nupur and escorted her to an ambulance. When Brown asked Nupur what had happened, she told the paramedic that Wilson had poured gas on her and set her on fire. Brown placed Nupur in the ambulance and turned to see a naked Wilson standing in the yard. Wilson had burns on his hands and portions of his forearms. Wilson told the paramedic that there had been an accident with the gas grill. On the way to the hospital, Nupur again told Brown as well as paramedic Shawn Grindstaff that she and Wilson were arguing when Wilson threw gasoline on her and lit her on fire. Wilson told another paramedic and a hospital nurse that the fire started when he and Nupur tried to light a grill using gasoline.

The following day, Indianapolis Police Department Sergeant John Breedlove went to the hospital to interview Wilson. Before the interview, Breedlove consulted with hospital staff who advised him that Wilson was taking Percocet for pain. Before questioning Wilson, Sergeant Breedlove read him his Miranda rights and had him sign a waiver of rights form. Wilson told the sergeant that he understood his rights, and the sergeant began to question him.

During the interview, Wilson asked to make a telephone phone call so that he could talk to someone because of the seriousness of the events. The sergeant told Wilson that he could stop answering questions at any time and allowed Wilson to make a telephone call. Wilson attempted to call his father, who he was unable to reach. After making the phone call, Wilson told the sergeant that the person he wanted to speak to was his father but that he was unable to reach him.

Sergeant Breedlove readvised Wilson of his rights, and Wilson told the sergeant that he understood those rights and was willing to continue answering questions. During the interview, Wilson appeared coherent, understood the questions the sergeant asked him, never became confused, and thought about and provided answers to the questions. Although Wilson delayed answering some of the questions about how Nupur became doused with gasoline and set on fire, Sergeant Breedlove interpreted Wilson's responses to be deceitful rather than confused.

During the interview, Wilson admitted that his previous story about the grill accident was not true. Wilson explained that he told that story because he panicked. According to Wilson, he was holding a gas can while he and Nupur were arguing. Nupur pulled on the can and gas apparently splashed on her and ignited when one of them lit a cigarette. Wilson explained that when Nupur drank alcohol, "she always got very, very argumentative and wanted to put Wilson down and wanted to say things to push buttons." The State subsequently charged Wilson with attempted murder and aggravated battery. Nupur, who had third degree burns on

> 80% of her body, was placed in a drug-induced coma to allow for treatment and pain management. After she died from multi-organ failure resulting from her burns five weeks later, Wilson was charged with murder.
>
> At trial, additional evidence revealed that in March 2007, while Nupur was staying at a hotel in Indianapolis, she and Wilson got into a physical altercation. Jimmy Barona, the hotel's owner, testified that Nupur's hair was messed up, and she had a black eye and scratches on her face. When Nupur and Barona told Wilson to leave Nupur's hotel room, Wilson pushed Nupur and appeared ready to fight Barona. Barona and a hotel maintenance worker had to physically remove Wilson from the room.
>
> In addition, a former neighbor testified that Wilson and Nupur argued every day. According to the neighbor, one night Wilson banged on Nupur's apartment door for hours demanding to be let into the apartment. The following morning, the neighbor noticed plaster from the ceiling and the walls had been knocked to the floor by Wilson's banging.
>
> Also at trial, ATF Fire Research Engineer Brian Grove testified that he conducted nine tests where gas was splashed on a manikin wearing jeans and a sweater similar to those that Nupur was wearing. The tests revealed that Nupur was seated when she was doused with approximately one-half cup of gasoline below her waistband and above her knees. The gasoline was then ignited with a flame, not a cigarette, which had to have been placed one to two inches from the gasoline. Two lighters were found on the patio where Nupur was sitting. One of the lighters was found on a table, and the other was found on the ground.
>
> Wilson testified that at the time he gave his statement to Sergeant Breedlove, Wilson was "pretty doped up," and easily confused. He also testified that Nupur set herself on fire and asked him not to tell anyone what she had done. A jury convicted Wilson of murder, and he appeals.

(*Wilson v. State*, No. 49A05–0806–CR–329, 2009 WL 104183, at \*1–\*2 (Ind. Ct. App. Jan. 16, 2009) (internal citations omitted), ECF No. 9-7.)

Wilson argues that he is entitled to habeas corpus relief, alleging that he received ineffective assistance of counsel because trial counsel did not introduce evidence related to his or the victim's blood alcohol content. Wilson presented these claims to the Court of Appeals of Indiana and the Indiana Supreme Court. (*See* ECF No. 9-11; ECF No. 9-15.) Therefore, he has properly exhausted his State court remedies, and the court will consider his claims on the merits.

## STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

ANALYSIS

Wilson argues that the State court made an unreasonable determination that trial counsel was not ineffective by failing to present evidence related to his and the victim's blood alcohol content. He argues that such evidence would have discredited the victim's statements and would have explained Wilson's inability to consistently and accurately recount the events on the date of the crime. He also argues that such evidence would have made the defense theory that the victim set herself on fire more plausible.

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In assessing prejudice under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

At trial, a medic testified that the victim told him that Wilson had poured gasoline on her and lit her on fire. Trial Tr. 147–48. A fire protection engineer testified that it was highly unlikely that a lit cigarette would ignite gasoline. *Id.* at 254. The engineer testified that the flame from a butane lighter could have caused the fire, but even then, a person would have to hold the

lighter within one or two inches of gasoline-soaked fabric for ignition. *Id.* at 255, 266–67. The victim suffered substantial burn injuries affecting eighty percent of her body, but her face and hands were spared. *Id.* at 309–12, 477. Wilson suffered burn injuries as well, but they were mostly confined to his hands and forearms. *Id.* at 156–57. Wilson testified that he suffered the burns in an effort to extinguish the fire by "trying to beat the flames with [his] arms" and by carrying the victim to the bathroom. *Id.* at 439–42, 452. However, a physician, who had substantial experience with treating burns, testified that he would have expected an individual carrying another person with burning clothing to have more severe injuries. *Id.* at 308–09. At closing, the prosecution argued that the expert testimony and the nature of Wilson's and the victim's injuries suggested that Wilson ignited the gasoline, reasoning that a person igniting the fire would have burned his or her hands and that only Wilson had burned hands. *Id.* at 526–27. Trial counsel argued that the fire was likely caused by the victim playing with a lighter. *Id.* at 501. Trial counsel also explained that the reason for advising Wilson to testify was to explain his burns and his reaction to the fire. *Id.* at 510.

  At trial, a substantial amount of evidence was introduced to show that the victim had issues with alcohol and that Wilson and the victim had consumed a significant amount of alcohol on the day of the fire. For example, the victim's mother testified that the victim had a drinking problem and that she went to Saint Jude Retreat House for rehabilitation and was planning to return. *Id.* at 9–13. A hotel owner testified that the victim had a half gallon of vodka in her hotel room two weeks before she was set to return to Saint Judge Retreat House. *Id.* at 224. Wilson and his mother also testified regarding the victim's struggles with alcohol. *Id.* at 386, 422–24. A medic testified that, during the ambulance ride to the hospital, the victim stated that she had drank "a lot." *Id.* at 151–52. A medic also testified that Wilson stated that he had drinking. *Id.* at

6

129. Wilson also testified that he and the victim had been drinking "a lot" that day. *Id.* at 434–35. Trial counsel repeatedly asked questions about the victim's consumption of alcohol that day and again alluded to it during closing arguments. *Id.* at 20, 141–42, 297–98, 352–53, 501, 513.

The evidence at trial revealed that Wilson's version of the events had various inconsistencies with the physical evidence and underwent several evolutions. When questioned by first responders immediately after the incident, Wilson told them that an outdoor grill had caused the burns. *Id.* at 119. However, it was discovered that the outdoor grill was covered and that it was a propane grill, which was inconsistent with the use of gasoline. Trial Ex. 73 at 19–20. When questioned by a detective on the following day, he stated that the victim spilled gasoline on herself when she jumped up and grabbed the gas container Wilson was carrying as he walked by her and that a short time later she was engulfed in flames. *Id.* at 6–7. By contrast, the fire engineer testified that, considering the location of the victim's burn patterns, it was more likely that the gasoline was placed on her while she was sitting. Trial Tr. 364–65. When testifying at trial, Wilson stated that the victim spilled gasoline on herself when she was sitting and grabbed the gas container Wilson was carrying as he walked by her; she then grabbed a pack of cigarettes and lighter; and a short time later she was on fire. *Id.* at 436–39. However, photographs depicting the location of the pack of cigarettes, the lighter, and a cellphone suggested that the victim was instead holding the cellphone and the lighter but no pack of cigarettes. Trial Ex. 11, 12.

Trial counsel attempted to account for these inconsistencies by eliciting Wilson's testimony that the victim had asked him to lie about the cause of the fire to avoid being perceived as mentally unstable and that he was on morphine during the interview with the detective. Trial Tr. 445–46, 456. At closing, trial counsel explained that Wilson's mistaken recollection

7

regarding the pack of cigarettes was because "everything was going so fast for [Wilson.]" *Id.* at 498.

At the post-conviction relief stage, Wilson argued that trial counsel was ineffective for failing to present evidence of the victim's blood alcohol content at the time of the fire and its effect on her behavior, memory, and perception. PCR App. 246–55. Wilson also argued that trial counsel was ineffective for failing to present evidence of Wilson's blood alcohol content at the time of the fire and its effect on his behavior, memory, and perception. *Id.* At an evidentiary hearing, Dr. Daniel McCoy reviewed the medical records and extrapolated that the victim's blood alcohol content was between .303 and .334. PCR Tr. 180-82. He testified that this alcohol level would have affected the victim as follows:

> Well, there are two features really basically that would be impacted. The sensory input itself. The functions of the eyes, the ears, the awareness, touch, feel, that sort of thing, all would be modified. So the sensory organs themselves at that kind of a high concentration level will be impacted so that they are not working as well. They will suffer decrease in their ability to perform. And then secondarily, the information that they're sending although it's not accurate, it even becomes less valuable for the brain because the brain has really been impacted to the point it will not process that information in a normal fashion. So it will be distorted. It will not really be representative of what's actually taking place.
>
> * * *
>
> This kind of concentration of alcohol and the type of repetitive exposure that a person may have had to be able to tolerate this would impact both short and long-term memory. So their ability to recall past events and even current events would be modified considerably.

*Id.* Dr. McCoy testified that Wilson's blood alcohol content was between .242 and .281 and that this alcohol level would have had a dramatic impact. *Id.* at 189-91. According to Dr. McCoy, a person at that alcohol level "would not have the normal ability to adequately perceive and process sensory information in a normal fashion." *Id.*

8

The post-conviction relief court found no deficient performance, noting that trial counsel had hired a physician to review the medical records and decided not to hire an expert because the evidence sufficiently demonstrated that the victim was extremely intoxicated and because voluntary intoxication was not a valid defense for Wilson. PCR App. 83–86. The court further found no prejudice with respect to the effect of alcohol on the victim, reasoning that the evidence indicated that she "was an alcoholic, had previously been in rehab, and was planning to re-enter rehab imminently" and that a paramedic testified that the victim had said that she had drank "a lot." *Id.* The court also found no prejudice with respect to the effect of alcohol on Wilson, reasoning that the defense strategy depended on the credibility of Wilson's testimony about the events on the day of fire. *Id.* Additionally, the court questioned whether the hospital blood tests could have been authenticated. *Id.*

The Court of Appeals of Indiana affirmed the lower court's decision with respect to the victim, reasoning that trial counsel presented evidence of the victim's intoxication and that the jury likely had understanding of the effects of intoxication. (Opinion at 12–15, ECF No. 9-14.) The appellate court also affirmed the decision with respect to Wilson, agreeing that trial strategy relied on the credibility of his testimony. (*Id.*)

After reviewing the record, the Court cannot conclude that the State court's determinations on the ineffective counsel claims were objectively unreasonable. As an initial matter, courts have frequently suggested that expert testimony is not necessary to explain the effects of alcohol on memory and perception. *See e.g., Grayson v. Thompson*, 257 F.3d 1194, 1221 (11th Cir. 2001); *United States v. Boyles*, 57 F.3d 535, 551–52 (7th Cir. 1995); *Mitchell v. Pszczolkowski*, NO. 2:15-cv-12156, 2016 WL 5661196, at *7 (S.D. W.Va. Sept. 29, 2016); *Morris v. Clay*, No. CIV S–08–1790, 2010 WL 2011583, at *12 (E.D. Cal. May 19, 2010);

9

*Stephenson v. State*, 864 N.E.2d 1022, 1044 (Ind. 2007). As detailed above, trial counsel presented a substantial amount of evidence regarding Wilson and the victim's use of alcohol. Moreover, the trial strategy relied on Wilson's credibility to present an exculpatory version of the events surrounding the fire to the jury and to explain the burns on his hands. Though trial counsel did not present blood alcohol content evidence to address the inconsistencies in Wilson's stories to the first responders, the detective, and the jury, he addressed them by other means. Considering the record as a whole, the State court's determination regarding deficient performance was not unreasonable.

Additionally, even if statements from the victim and Wilson were entirely omitted, the trial record would contain ample evidence of Wilson's guilt. Specifically, the fire engineer's expert testimony strongly implied that the person who set the victim on fire would have burned his or her hands. Further, the medical evidence indicated that the victim suffered burns on nearly every part of her body, except for her hands, and that Wilson suffered burns only to his hands and wrists. Finally, the burn specialist's expert testimony cast doubt on the possibility that Wilson incurred his burns in an attempt to rescue the victim. Considering the significant probative value of the medical evidence and expert testimony and the minimal probative value of the proposed alcohol-related evidence, the State court's determination regarding lack of prejudice was not unreasonable. Therefore, Wilson's claims of ineffective assistance of counsel are not a basis for habeas relief.

Pursuant to Section 2254 Habeas Corpus Rule 11, the Court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should

have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this Opinion and Order for denying habeas corpus relief, there is no basis for encouraging Wilson to proceed further.

## CONCLUSION

Accordingly, the court DENIES the habeas corpus petition; DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the Clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on June 22, 2018.

> s/ Theresa L. Springmann
> CHIEF JUDGE THERESA L. SPRINGMANN
> UNITED STATES DISTRICT COURT